## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, David Furtado, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Google, Inc, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California, specifically, a Google e-mail account, niki.meds@gmail.com.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. Section 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2. I am a Special Agent with the Office of Criminal Investigations, United States Food and Drug Administration (hereinafter "FDA/OCI") and report to the Boston, Massachusetts Resident Office.

3. I have been a Special Agent with FDA/OCI since April 2004.  Prior to my employment with FDA/OCI, I conducted criminal investigations as a Special Agent with the United States Department of Health and Human Services (HHS), Office of the Inspector General for approximately seven years.  These investigations related to fraud, waste, and abuse in HHS programs including investigations of individual practitioners, medical providers, and pharmaceutical manufacturers.  I have attended numerous federal agency sponsored training courses and the Federal Law Enforcement Training Center.

4. As a Special Agent with FDA/OCI, I am responsible for conducting criminal investigations involving violations of the Federal Food, Drug, and Cosmetic Act (hereinafter "FFDCA"), Title 21, United States Code, Section 301, *et seq.*, and other federal statutes enforced by the United States Food and Drug Administration (hereinafter "FDA").

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of federal criminal law have been committed, specifically: (a) introduction into interstate commerce of unapproved new drugs (21 U.S.C. §§ 331(d) and 355(a)); (b) distribution of controlled substances, based on several purchases of the controlled substance Valium made by a resident of New Hampshire from the websites www.preimummedz.com and www.generictab.com without proper DEA registration (21 U.S.C. §§ 841 and 846); and (c) trafficking in counterfeit merchandise, based on the purchase of "Cialis" made by a consumer from the web site www.premiummedz.com (18 U.S.C. § 2320(a)). And there is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

7. I along with an agent from the Federal Bureau of Investigation (hereinafter "FBI") are currently investigating a web site that is currently selling both controlled and non-controlled prescription drugs. In summary, the investigation to date has revealed that the web site has sold both controlled and non-controlled prescription drugs: (1) without being currently licensed by the

State of New Hampshire as a Mail Order Pharmacy; (2) without being currently registered with the Drug Enforcement Administration to distribute controlled substances; and (3) without obtaining FDA approval to market a new drug.

8. Based on evidence gathered during the current investigation, I respectfully submit that there is probable cause to believe that the email account Niki.meds@gmail.com maintained at Google contains evidence of commission of: (a) introduction into interstate commerce of unapproved new drugs (21 U.S.C. §§ 331(d) and 355(a)); (b) distribution of controlled substances, based on several purchases of the controlled substance Valium made a resident of New Hampshire from the websites www.preimummedz.com and www.generictab.com without proper DEA registration (21 U.S.C. §§ 841 and 846); and (c) trafficking in counterfeit merchandise, based on the purchase of "Cialis" made by a consumer from the web site www.premiummedz.com (18 U.S.C. § 2320(a)).

**Legal Background**

9. The FDA is responsible for enforcing the provisions of the Federal Food, Drug and Cosmetics Act (FFDCA). Under the FFDCA, the term "drug" includes articles which are intended (1) for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man and (2) to affect the structure or any function of the body of man. 21 U.S.C. § 321(g)(1)(B) and (C).

10. Under the FFDCA, the term "new drug" includes any drug which is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof. 21 U.S.C. § 321(p)(1).

11. Pursuant to Title 21, United States Code, Section 355(a), a new drug may not be introduced into interstate commerce unless a New Drug Application or Abbreviated New Drug Application has been approved by FDA.

12. Introducing or causing the introduction into interstate commerce of a new drug that does not have an approved application, *i.e.,* an unapproved new drug, is prohibited. 21 U.S.C. § 331(d).

13. Pursuant to Title 21, United States Code, Section 353(b)(1)(A), prescription drugs are defined as those drugs which, because of their toxicity and other potential harmful effects, are not safe for use except under the supervision of a practitioner licensed by law to administer such drugs or those drugs which were approved by FDA for use only under the supervision of a licensed practitioner.

14. Title 21, United States Code, Section 353(b)(1)(B) provides that a prescription drug may be dispensed only upon the prescription of a licensed practitioner. Dispensing a prescription drug without the prescription of a licensed practitioner is deemed to be an act which results in the drug being misbranded while held for sale.

15. Under Title 21, United States Code, Section 331(a), the introduction into interstate commerce of any misbranded drug is prohibited.

16. The Controlled Substances Act (CSA) created a closed system of distribution for prescription drugs classified as controlled substances because of their potential for abuse. Pursuant to Title 21, United States Code, Section 841, it is unlawful to manufacture, distribute, dispense or possess controlled substances unless authorized by the CSA and its regulations. Pharmacies that dispense controlled substances must be registered with the Drug Enforcement Administration (DEA). For a prescription of a controlled drug to be effective, it must comply

with Title 21, Code of Federal Regulations, Section 1306.04(a). This section provides that a prescription for a controlled substance is effective only if it is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription not issued in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Title 21, United States Code, Section 829, and the person knowingly filling such a prescription, as well as the person issuing it, is subject to the penalties provided for violations of the provisions or laws relating to controlled substances.

17. Based upon my experience participating in other cases involving internet pharmacies, I know that internet pharmacies commonly advertise themselves to customers as legal sellers of prescription drugs, including controlled substances, even though the customer has no or very little contact with a doctor. The internet pharmacies typically allow their customers to choose the drugs they want to purchase instead of allowing a physician to determine the appropriate treatment based upon an evaluation of the customer's symptoms, medical history and other factors that a legitimate doctor would consider before making a diagnosis and formulating a treatment plan. Internet pharmacies sometimes ask customers to fill out a superficial questionnaire containing questions about the customers' health. This questionnaire may then be reviewed by a doctor affiliated with the web site before the drugs are shipped to the customer. The customers of these internet pharmacies are not examined by the prescribing physician and often are not even located in the same state as the prescriber. Some internet pharmacies do not

ask any health questions and do not require a prescription from a doctor before unlawfully dispensing the prescription drug.

18. New Hampshire state law, RSA 318.37, governs the licensure of pharmacies in New Hampshire as well as mail-order pharmacies operating outside of New Hampshire. It requires that any person who operates a pharmacy in New Hampshire for the retail sale of drugs must be registered with the Board of Pharmacy. It further provides that mail-order pharmacies located outside of the State may not ship, mail, or deliver prescription drugs into the state unless the pharmacy is registered with the New Hampshire Board of Pharmacy. I have checked with New Hampshire Board of Pharmacy and have been advised that neither web site referenced herein is registered with the State of New Hampshire.

**Consumer Complaint - Purchase of Controlled Substance, Valium**

19. On March 3, 2010, FBI SA Kathleen Fuller and I met with Laura Towle, power of attorney for Kenneth Howe, in Whitefield, New Hampshire (Howe was reportedly involved in a motor vehicle accident and is incapacitated as a result). Towle provided information to us regarding an alleged extortion of Howe as well as his purchases of prescription drugs from numerous internet sites. Towle reported to us that that on November 23, 2009 and November 24, 2009, Howe placed orders for generic Valium from two internet sites, www.premiummedz.com and www.generictab.com. After placing these orders, Howe received emails from these websites confirming the orders.

20. According to an email received by Howe on November 23, 2009 from service@medsupportonline.com, Howe placed an order for 60 generic Valium pills for $193 (including $35 for shipping) and used his Visa card for the purchase. The email states that the

invoice is from generictab.com and informs Howe that the charge to his credit card will appear from MD Internet.

21.    According to a second email received by Howe on November 23, 2009 from service@premiummedz.com, Howe placed a second order for 240 generic Valium pills for $593 (including $35 for shipping). According to the email, the representative from Premiummedz.com is Niki Davis. On the next day, Howe received another email from this same email address informing him that his transaction was approved, that he used his Visa card for the purchase, and that the charge to his credit card will appear from MD Internet.

22.    Towle also provided a copy of Howe's Visa Card statement for this time period which reflects a charge from MD Internet for $193 for a purchase made on November 23, 2009 and a second charge from MD Internet for $593 for a purchase made on November 24, 2009.

23.    On November 24, 2009 and again on November 27, 2009, Howe received emails from the above two email address but both addressed from a Rebecca Taylor claiming to be from the customer service department. These emails inform Howe that his orders have been shipped and provide Howe with tracking numbers. The tracking number for Howe's purchase from premiummedz.com was listed as 420035819405503699300052605535.

24.    On November 28, 2009, Howe received an email from Niki Davis with an email address of Niki.meds@gmail.com. Davis is listed as the Account Executive of the VIP Department. This email provides Howe with the same tracking number listed above. Further, the email informs Howe of the following: "Remember that we carry Sleeping aids (Ambien, Sonata, Imovan), Anti anxiety medication (Xanax, Valium, Klonopin and Ativan), Tamiflu (Swine Flu prevention), Pain relief medication (Soma, Tramadol) and ALL ED products!" Finally, the email

lists Davis' phone number as 888-920-0540 x256, the phone number listed on the website www.premiummedz.com.

25. On December 2, 2009, Howe wrote an email to Davis thanking her for keeping him updated. Howe then received a response from Davis with an email address of Niki.meds@gmail.com asking him is he needed anything except for Valium and informing him they have Xanax, Ativan, and Klonopin.

**Report from Pharmaceutical Manufacturer Eli Lilly - Counterfeit Cialis**

26. On or about February 19, 2010, the pharmaceutical manufacturer Eli Lilly submitted a report to FDA/OCI concerning a suspect counterfeit drug purchased by a consumer. Specifically, the report provides that the consumer had purchased the prescription drug Cialis from the web site www.premiummedz.com via phone number 888-920-0540. Initially, the consumer indicated that the sample had been shipped from India but later reported that the package was received from China (the report indicates that all shipping materials were thrown away). The consumer submitted two (2) cartons labeled as Cialis, each containing two (2) blister packs of four (4) tablets. Due to observed physical differences in the packaging and product, Eli Lilly conducted separate analysis of the two cartons. The analysis of the first carton revealed that the batch number was a valid number for Eli Lilly's product named Snafi (20mg Tadalafil) co-marketed in the Persian Gulf. Further, the combination of the batch number and expiration date was not a valid combination for Cialis. Further, Eli Lilly observed that the physical appearance of the product was not consistent with authentic Cialis and its analysis of the tablets revealed they were not consistent with authentic Cialis (the tablets were found to contain both the active ingredient in Cialsis (tadalafil) and the active ingredient in Viagra (sildenafil)).

27. Eli Lilly's analysis of the second carton revealed that the batch number was a valid number for Eli Lilly's product named Snafi (20mg Tadalafil) co-marketed in the Persian Gulf. Further, the combination of the batch number and expiration date was not a valid combination for Cialis. Further, Eli Lilly observed that the physical appearance of the product was not consistent with authentic Cialis and its analysis of the tablets revealed they were not consistent with authentic Cialis (the tablets did not contain the active ingredient in Cialis but instead were found to contain the active ingredient in Viagra.)

**Review of Premiummedz.com Website**

28. My review of the website www.premiummedz.com revealed that the web site claims to have physicians specializing in consulting "with privacy-minded individuals and prescribing popular medications. These medications, sometimes called "embarrassment" drugs, are prescribed and dispensed by our physicians and pharmacists." Further, the website states that if you have had a physical exam recently and consider yourself healthy, you do not necessarily require another physical exam in order for you to obtain the medications offered.

29. A review of the website reveals that the following "generic" products are offered for sale: Cialis (Tadalafil), Levitra (vardenafil), Celebrex (celecoxib), Meridia/Reductil (sibutramine), Xenical (Orlistat), Tamiflu, Benicar, and Nexium. I conducted a review of the FDA web site to determine if there were any generic equivalents approved by FDA and found that none of these drugs have approved generic equivalents that can be marketed legally in the United States. Further, the brand name drugs have been approved by the FDA for marketing in the United States but are only available after obtaining a prescription from a practitioner licensed by law to administer these drugs (i.e. prescription drugs).

30. Further, the website offers to sell a "generic" Prilosec. A review of the FDA website revealed that this drug has been approved by the FDA as both a prescription and over-the-counter drug and there are no approved generics of this drug. Finally, the website offers to sell a "generic" Accutane. This drug, which at one time was approved for marketing by the FDA, is no longer approved for marketing in the United States.

31. A review of the website also revealed that the following schedule IV controlled substances are offered for sale: Ambien, Valium, Xanax, Ativan, and Klonopin.

32. On May 16, 2010, I consulted with the Drug Enforcement Administration and was informed that the website www.premiummedz.com is not registered with DEA to dispense controlled substances.

33. On May 27, 2010, records were sought from Google to establish that the e-mail account was still then active and to identify the subscriber and originating IP addresses for connections to the e-mail account. On June 16, 2010 Google produced records indicating that an individual identifying herself as "Niki Davis" created the e-mail account on January 22, 2009 and at the time the account was created the person had connected to Google from IP Address 212.25.68.178. A search of publically available records showed that IP address is assigned to an ISP in Israel. The Google records also disclosed numerous connections to the e-mail account in May and June of 2010 from IP addresses assigned to ISPs in Israel.

34. In my experience, in cases such as these, there are often many individuals and entities involved in the distribution chain, including manufacturers, middlemen distributors, freight forwarders, people or entities involved in the "retail" distribution, and individuals or entities involved in processing payments for the drugs; much the same as in legitimate businesses, product is manufactured, distributed and payment is collected.

**Evidence preservation requests pursuant to 18 U.S.C. § 2703(f)**

35.  On April 29, 2010, a request, pursuant to Title 18 United States Code, Section 2703(f)(1) was faxed to Google requesting that all stored electronic communication associated with niki.meds@gmail.com be preserved for 90 days.  A second, follow up preservation request extension was served upon Google.  Consequently, there is probable cause to believe that evidence is still present at Google, irrespective of whether the underlying business is still ongoing.

**TECHNICAL BACKGROUND**

36.  In my training and experience, I have learned that Google provides a variety of on-line services, including e-mail access to the general public.  The general public can obtain an account by registering with Google and, during the registration process, Google may ask subscribers to provide basic personal information.  Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, e-mail transaction information, and account application information.  Additionally, when a person sets up an e-mail account Google records the IP Address of the computer used by their subscriber to set up the account.  Google also records the originating IP Address (the IP Address from which their subscriber connects) each time a subscriber connects to the Google e-mail servers.  Google e-mail accounts are named along the lines of "[name]@gmail.com."

37.  In general, an e-mail that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Google servers indefinitely.

38. When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Google's servers, and then transmitted to its end destination. Google often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Google's server, the e-mail can remain on the system indefinitely.

39. A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by Google but may not include all of these categories of data.

40. A Google subscriber can also store files, including e-mails, address books, contact or buddy lists, pictures, and other files, on servers maintained and/or owned by Google.

41. Subscribers to Google might not store on their home computers copies of the e-mails stored in their Google account. This is particularly true when they access their Google account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

42. In general, e-mail providers like Google ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

43. E-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and

durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

44.   In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

45.   In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

46.   I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.

Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

47.     Based on evidence gathered during the current investigation, I respectfully submit that there is probable cause to believe that the email account Niki.meds@gmail.com maintained at Google contains evidence of commission of: (a) introduction into interstate commerce of unapproved new drugs (21 U.S.C. §§ 331(d) and 355(a)); (b) distribution of controlled substances, based on several purchases of the controlled substance Valium made a resident of New Hampshire from the websites www.preimummedz.com and www.generictab.com without proper DEA registration (21 U.S.C. §§ 841 and 846); and (c) trafficking in counterfeit merchandise, based on the purchase of "Cialis" made by a consumer from the web site www.premiummedz.com (18 U.S.C. § 2320(a)).

48.     This Court has jurisdiction to issue the requested warrant because it is "a court with jurisdiction over the offense under investigation." 18 U.S.C. § 2703(a).

49.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

**REQUEST FOR SEALING**

50.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my

training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, e.g., by posting them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.  A Motion to Seal is filed herewith.

Respectfully submitted,

David Furtado
Special Agent
FDA/Office of Criminal Investigations

Subscribed and sworn to before me on September 17, 2010:

Landya B. McCafferty
United States Magistrate Judge

## ATTACHMENT A

### Place to Be Searched

This warrant applies to information associated with the e-mail account niki.meds@gmail.com that is stored at premises owned, maintained, controlled, or operated by Google, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, California.

## ATTACHMENT B

### Particular Things to be Seized

I.    **Information to be disclosed by Google**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, Google is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.    The contents of all e-mails stored in the account, including copies of e-mails sent from the account;

b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.    All records or other information stored by an individual using the account, including address books, contact and buddy lists, pictures, and files;

d.    All records pertaining to communications between Google and any person regarding the account, including contacts with support services and records of actions taken.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of the statutes listed on the warrant involving www.premiummedz.com, www.generictab.com, or any related websites including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a)     The introduction into interstate commerce of unapproved new drugs, specifically new drugs not approved for use in the United States (21 U.S.C. § 331(d));

(b)     The distribution of controlled substances (21 U.S.C. §§ 841 and 846);

(c)     The trafficking in counterfeit goods (18 U.S.C. § 2320(a));

(d)     Records relating to who created, used, or communicated with the account;

(e)     Evidence of financial transactions related to items listed above in paragraphs (a) through (d);

(f)     Evidence concerning the source and/or manufacture of the drugs being distributed;

(g)     Evidence identifying any person or entity in the chain of distribution of the drugs;

(h)     Evidence of other e-mail accounts or methods of communication used by those involved in the manufacture and/or distribution of the drugs at issue.